# PEOPLE OF PORTO RICO
## *v.*
# NEW YORK & PORTO RICO STEAMSHIP COMPANY.

MOTION TO DISSOLVE TEMPORARY INJUNCTION AND DISMISS BILL—PUBLIC
LANDS—MILITARY LICENSE—RIPARIAN RIGHTS—INJUNCTION.

1. While parties are perfecting pleadings it would be irregular to act upon
a motion to dismiss bill for want of equity, although determining the
motion to dissolve temporary injunction may virtually determine the
case.

2. By the treaty of Paris the United States was vested with the right
formerly belonging to Spain in crown lands in Porto Rico; and the
War Department had power to grant a revocable license for the
building of a wharf in the harbor of San Juan.

3. A complainant owning the riparian right to harbor shores can enjoin the
building of a wharf which would rest on those shores, but cannot en-
join the use of the navigable waters of the harbor, for they belong
to the United States.

4. A complainant, to obtain injunctive relief, must present an equitable

---

*Navigable waters—riparian rights.* The authorities bearing on various
questions relating to the rights of riparian proprietors in the shore bor-
dering on, and the land under, navigable waters, are presented in the fol-
lowing editorial notes: *What waters are navigable,* notes to Willow River
Club v. Wade, 42 L. R. A. 305; Gibson v. United States, 41 L. ed. U. S.
997; *What are navigable waters of the United States,* notes to United
States v. The Montello, 22 L. ed. U. S. 391; Perry v. Haines, 48 L. ed. U.
S. 73; *State control as distinguished from Federal control over navigable
waters,* note to Gibson v. United States, 41 L. ed. U. S. 997; *Public rights
on navigable waters,* note to Gibson v. United States, 41 L. ed. U. S. 997;
*Obstruction of navigable stream by log boom,* note to United States v.
Bellingham Bay Boom Co. 44 L. ed. U. S. 437; *Right to use stream for
floating logs,* note to Carlson v. St. Louis River Dam & Improv. Co. 41 L.
R. A. 371; *Right of owner of upland to access to navigable water,* note
to Washington ex rel. Denny v. Bridges, 40 L. R. A. 593; *Right of access*

People of Porto Rico v. New York & P. R. S. Co.

state of case. Where a revocable license granted by the War Department provided that the United States or Porto Rico reserves the right after three months' notice to take the wharf from the licensee upon the payment of the value of the structure, and the complainant seeks by injunction to prevent the repair of said wharf when injured by fire, it must show that it has done equity and complied with the terms of the license by the offer to the company of its value, before the court will act by injunction.

May 4, 1903.

---

*Mr. J. S. Harlan,* Attorney General, for complainant.

*Messrs. John G. Carlisle, E. B. Whitney, N. B. K. Pettingill,* and *F. K. Curtis* for defendant.

HOLT, Judge, delivered the following opinion:

This action was begun in the insular district court for San Juan on April 17th, 1902, in the name of The People of Porto Rico, to prevent the New York & Porto Rico Steamship Company from repairing or rebuilding the wharf or pier in the

---

to *water,* note to Slater v. Gunn, 41 L. R. A. 268; *Title to land under water,* note to Goff v. Cougle, 42 L. R. A. 161; *Title to land between high and low water mark,* note to Waverly Water Front Improv. & Development Co. v. White, 45 L. R. A. 227; *The law of accretion to shore land,* note to De Lassus v. Faherty, 58 L. R. A. 193; *Effect of sudden submergence upon title to land,* note to Chicago v. Ward, 38 L. R. A. 849; *Division of water front, alluvion, and flats between adjoining riparian owners,* note to Northern Pine-Land Co. v. Bigelow, 21 L. R. A. 776; *Separation of riparian rights from upland,* note to Gratz v. Land & River Improv. Co. 40 L. R. A. 393.

*Wharves. Public right of access to water,* note to Slater v. Gunn, 41 L. R. A. 268; *Right of United States and the states to shore lands and accretions against piers,* note to Doe ex dem. Hallett v. Beebe, 14 L. ed. U. S. 35; *Right of riparian owner to construct,* note to Ex parte Easton, 24 L. ed. U. S. 373.

harbor of San Juan that had been partially destroyed by fire on April 30th, 1901. A temporary injunction upon an *ex parte* hearing was sued out, and then the case was in the proper manner transferred to this court.

A motion is now made by the defendant to dissolve the injunction and dismiss the bill for want of equity. In this motion the defendant is the actor, and its answer is to be taken as true so far as responsive to the bill.

It is proper at this stage of the case to determine only the motion to dissolve the injunction, even though this may virtually determine the case. It would be irregular to act upon the motion to dismiss the bill for want of equity while the parties are perfecting the pleadings. Lavega v. Lapsley, 1 Woods, 428, Fed. Cas. No. 123; Betts v. Lewis, 19 How. 72, 15 L. ed. 576.

From the fall of 1898 to May 1st, 1900, when civil government was organized in Porto Rico, the War Department of the United States was the governing power. It was both the *de facto* and the *de jure* government of Porto Rico. Early in 1899 the New York & Porto Rico Steamship Company applied to the military authorities for a franchise to construct and maintain a pier in the harbor of San Juan. The application reached the Secretary of War, and he applied to the military commander in Porto Rico for information upon the subject. Opinions were given by various officials, including the law officer of the War Department; the matter was fully investigated as to its policy and legality, and, finally, on September 5th, 1899, not a franchise, but a license, was granted by the acting Secretary of War for its erection. Subsequently, and on February 28th, 1900, a second license was granted by the Secretary of War. It was like the first one, save it authorized the construction of a longer pier. It was entitled "Revocable License." The preamble recited: "The New York & Porto Rico Steamship Com-

pany is hereby granted a license, revocable at will by the Secretary of War, to build and maintain a wharf and building thereon in the harbor of San Juan, Porto Rico, at the location shown on the attached drawing, upon the following provisions and conditions." Among the conditions it was provided that vessels owned or chartered by the United States and in the military or naval service were to have the privilege of lying at, receiving and discharging freight from, the wharf without dues, the right not to be exercised so as to interfere with its use by the licensee.

Under condition 10, the material and work done was to be approved by the United States engineer, and the cost thereof be reported to the Secretary of War; and condition 11 provided: "The United States or Porto Rico reserves the right at any time, after three months' notice, to take the wharf from the licensee upon paying to it the value of the structure at the time it shall be so taken, and the amount paid shall not exceed the original cost of the same, as may be fixed under condition 10. In case the United States or Porto Rico should claim that the value of the structure when seized and taken is less than its original cost, the extent of deterioration or diminution from the original value shall be determined by a board or commission of four members, two of whom shall be appointed by the United States and two by the licensee or its successor. If the four members thus chosen and appointed shall not be able to agree, they may choose, by mutual agreement, a referee, whose decision shall be final; and in no case shall the amount to be paid exceed the original cost as fixed under the provisions of condition 10."

Under this license, the defendant company, about February, 1900, erected a wharf costing over $100,000. On April 30th, 1901, it was destroyed by fire, save the piling and approaches. The tops of the piles were left in a charred condition. The defendant company put iron caps thereon, and were about to re-

build the pier, when it was first stopped by the police force of San Juan, and then by the injunction in this case.

It is contended by the complainant that the license was revocable at pleasure, and could be done without any compensation whatever to the steamship company for the value of the structure when it might be revoked; that it was entirely optional with the United States or Porto Rico (as the one or the other at the time might have the right) whether it would take the wharf by the payment of its value. The other side concedes the license was revocable; but that if done, it must be as provided in condition 11, to wit, by payment of the then value; that this was the method of revocation.

Much has been said in argument as to the right to, and control of, the harbor and its shores. In Porto Rico the Spanish government held as national property the submerged lands in the harbors, the land between high and low watermark, and a zone of service in San Juan extending back, approximately 50 feet, from high watermark. The bulkheads and shore line were crown property and controlled by a junta, or board. By the treaty of Paris the United States was vested with the title formerly belonging to Spain. It came into the control, not only of the submerged land in the harbor and the waters thereof, but also of the shore line. In the organic act, creating civil government in Porto Rico, of April 12th, 1900, § 13, the United States transferred the control of the harbor shores, not including, however, harbor areas or navigable waters, to Porto Rico.

Undoubtedly the complainant cannot enjoin the building of a wharf over the navigable waters or submerged land in the harbor. They are subject to the control of the United States, but the riparian right upon which the wharf rests is now in Porto Rico, and while the bill in this case asks more, it should be regarded as one to enjoin the company from using the shore as

People of Porto Rico v. New York & P. R. S. Co.

a resting place for the end of its pier, or as a landing place for it. In other words, that the complainant is entitled to free access to and from the harbor shore. Undoubtedly it may ordinarily protect such a right from interruption by injunction. To have free and unobstructed access from its land to the abutting harbor is a property right, and injunctive relief against its continuous invasion may be had. Any unauthorized appropriation of public property may be enjoined in equity. Coosaw Min. Co. v. South Carolina, 144 U. S. 550, 36 L. ed. 537, 12 Sup. Ct. Rep. 689.

When the defendant proposed to rebuild, by virtue of the right a licensee has to repair, it applied to the War Department for privilege to do so, and the Secretary of War gave permission. It is claimed the complainant cannot, therefore, maintain this action. This permission evidently, however, referred only to the navigable waters under the control of the United States, and was but the customary license in such a case. The argument, therefore, that having been authorized by the Secretary of War under the provisions of the river and harbor act it is not a nuisance, cannot affect the complainant's right to the injunction if otherwise entitled to it.

It is said the license was revoked *ipso facto* when the military authority ceased in Porto Rico, and if this be not so, that then it was revoked by the transfer from the United States to Porto Rico of the control of the harbor shore, and that, in any event, the legislature of Porto Rico by the act of February 21st, 1902, expressly revoked all right that the defendant company had as to the harbor of San Juan. Undoubtedly an executive officer of the United States cannot grant its property. This power, by the Constitution of the United States, is vested in Congress. This license, however, was given when the military authorities were the governing power in Porto Rico. It must

be presumed there was a necessity for it. By its terms a bene-
fit was to accrue to the United States. Its vessels were to have
the use of the wharf free. The parties undoubtedly contemplat-
ed that the defendant company would expend a large sum of
money in its construction. The license may properly be read in
the light of the official correspondence that preceded the grant-
ing of it, and which is in the record. While it provides for
revocation at will, and which means at any time, it would be in-
equitable to permit one party to arbitrarily revoke it without fair
return to the other. If this be not so, then the defendant com-
pany might have built a pier costing thousands of dollars and
its license have been revoked within a month after its doing so
without any return to it for its expenditure. This, in effect,
would work a fraud. The structure is of such a character and
in such a place that its value would thereby have been destroyed.
No compensation for so much of the structure as remains un-
destroyed has been offered to the defendant; none has been pro-
posed; there has been no offer that it be ascertained; injunctive
relief is not asked upon any such condition, but that the use be
enjoined without any compensation whatever for so much of the
work as is yet in existence, or making any provision for any.
The question of what is equitable should have consideration.
The Congress of the United States in the act of July 1st, 1902,
granting public lands to Porto Rico, has recognized this by
providing that nothing contained in the act is to affect any legal
or equitable rights acquired by any party under any contract,
lease, or license made by the United States prior to May 1st,
1900.

During the military occupation of New Orleans in the Civil
War of 1861–5, a lease of water front property was made to a
steamship company by city authorities appointed by military au-
thorities. It was really a lease by the latter. It gave the ex-

People of Porto Rico v. New York & P. R. S. Co.

clusive right for the term of ten years upon the payment of an annual rental, and the company expended a large sum of money upon the improvements specified in the lease. Within a few months after its execution the military commander forbade the military city authorities to grant any right extending longer than the establishment of civil government, and in less than two months thereafter the city government was transferred to the civil authorities. A month after, these authorities undertook to remove by force a part of the wharf property. In a suit by the company for injunction and damages, it was urged that whatever power the military authorities possessed terminated with the end of hostilities, but the Supreme Court of the United States in passing upon the matter, as reported in New Orleans v. New York Mail S. S. Co. 20 Wall. 387, 22 L. ed. 354, held that the lease was a fair and reasonable exercise of the power vested in the military authorities, and sustained the injunction.

In this case the steamship company is the defendant, and the complainant is the one asking equitable interference. To obtain it the complainant must present an equitable state of case. It must be understood that this court does not hold that the license in this case continues as a vested right against the complainant. This opinion is not based on any such ground, but that the complainant should do equity before asking it; and not appearing in this light the temporary injunction herein is dissolved.