**UNITED STATES ex rel. SEYMOUR v. FISCHER, Sheriff, et al.**

**UNITED STATES ex rel. WATSON v. SAME.**

(District Court, D. Nebraska, Lincoln Division. February 27, 1922.)

Nos. 373, 374.

1. **Constitutional law $\Longleftrightarrow$255—May be lawful for military commander to imprison citizen.**

Due process of law depends on circumstances, and varies with the subject-matter and the necessities of the situation, and imprisonment of citizens by a military commander may be lawful in some cases.

2. **Militia $\Longleftrightarrow$15—Governor of state may use militia to suppress insurrection, and declaration of state of insurrection conclusive.**

Under Const. Neb. art. 5, § 14, and Rev. St. Neb. 1913, §§ 3904, 3913, 3916, the Governor of such state may use the militia to suppress insurrection, and his declaration of the existence of a state of insurrection is conclusive.

3. **Militia $\Longleftrightarrow$15—Proclamation held declaration of state of "insurrection."**

Proclamation of Governor of Nebraska, describing condition as being lawless and disorderly beyond the control of the civil authorities, and declaring martial law, was equivalent to a declaration of the existence of that organized resistance to authority known as "insurrection," within Const. Neb. art. 5, § 14, and Rev. St. Neb. 1913, §§ 3904, 3913, 3916, authorizing him to call out the militia, though the word "insurrection" was not used.

[Ed. Note.—For other definitions, see Words and Phrases, Insurrection.]

4. **Militia $\Longleftrightarrow$15—Military commander becomes controlling authority in occupied territory.**

When a state of insurrection exists, and the Governor of Nebraska has legally called into action the military forces of the state, under Const. Neb. art. 5, § 14, and Rev. St. Neb. 1913, §§ 3904, 3913, 3916, the will of the commander becomes the controlling authority in the occupied territory, so far as he chooses to exert it, subject to the laws and usages of war.

5. **Militia $\Longleftrightarrow$15—Military power in occupied territory extends to trial and punishment of offenders against regulations made by commander.**

The military power in occupied territory declared under martial law, under Const. Neb. art. 5, § 14, and Rev. St. Neb. 1913, §§ 3904, 3913, 3916,

extends to the trial and punishment of offenders against regulations made by the military commander, such as those prohibiting the passing of the military lines by persons without permission, the possession of arms and ammunition, and the sale of intoxicating liquors; and the power of the military forces is not limited to the arrest and detention of offenders against the laws of the state, until they can be delivered to the civil authorities for trial on the restoration of peace and order, though the military commander may avail himself of the courts as a means of trial, instead of instituting tribunals during the emergency.

6. Militia ☞21 —Sentence of imprisonment by military tribunal continued after peace.

A sentence of imprisonment by a military tribunal instituted by Governor of Nebraska as to a portion of the state in state of insurrection can be continued after peace is declared and order restored, under Const. Neb. art. 5, § 14, and Rev. St. Neb. 1913, §§ 3904, 3913, 3916.

At Law. Applications by the United States, on the relation of Hugh Seymour and of Ernest Watson, respectively, for writs of habeas corpus to obtain their release from the custody of Edward H. Fischer, Sheriff, and others. Rule to show cause why the writ should not issue discharged.

Jamieson, O'Sullivan & Southard, of Omaha, Neb., for plaintiffs.

Wm. H. Pitzer, Earl M. Cline, and Paul Jessen, all of Nebraska City, Neb., Clarence A. Davis, Atty. Gen., of Nebraska, and R. F. Stout, of Lincoln, Neb., for defendants.

MUNGER, District Judge. These are applications for writs of habeas corpus by two persons who have been committed to a term of imprisonment in a county jail of this state. The facts leading up to the imprisonment are as follows:

The Governor of the state had issued a proclamation declaring the existence at Nebraska City of a state of lawlessness and disorder beyond the control of the civil authorities, and that the local officers had applied for military assistance to be placed in control of that territory for the restoration and maintenance of law and order. The proclamation therefore declared the territory to be subject to martial law, and ordered the National Guard of the state to occupy the territory for the purpose of restoring law and order. After the troops were in possession of the territory, the Governor authorized the appointment of military commissions to try offenses against the public peace and violations of any military rules and regulations.

Each of the petitioners was charged with violation of some of these regulations, one in retaining in his possession arms, equipment, and munitions of war, and the other in keeping open a prohibited place of business, and each was found guilty and sentenced, and the commitments are in pursuance of these sentences. The petitioners were not employed in the military service and were citizens of Nebraska City. The state courts at Nebraska City were open during all the time of military occupation. After the petitioners had served a portion of their sentences, the Governor issued a proclamation reciting that violence and disorder had ceased at Nebraska City, and he therefore terminated martial law and withdrew the troops.

The chief claim of the petitioners is that their continued imprisonment violates the due process of law guaranteed to them by the Fourteenth Amendment to the Constitution of the United States: (1) Because martial law did not exist at the time of their alleged offenses; (2) because the military commission had no power to try them; and (3) because sentence by the commission could not outlast the period of military occupancy.

[1] Due process of law depends upon circumstances, and varies with the subject-matter and the necessities of the situation, and imprisonment of citizens by the military commander may be lawful in some cases. Moyer v. Peabody, 212 U. S. 78, 29 Sup. Ct. 235, 53 L. Ed. 410. Article 5, § 14, of the Nebraska Constitution makes the Governor commander of the military forces of the state, and authorizes him to call out the militia to execute the laws and suppress insurrection. Section 3904 of the Revised Statutes of Nebraska (1913) authorizes the Governor, as commander-in-chief of the militia, to employ it in the defense or relief of the state, or any part of its inhabitants or territories, and gives him all the powers necessary to carry into effect the provisions of that chapter of the Statutes.

Section 3913 of the same chapter provides that the militia may be called into service in time of war, invasion, riot, rebellion, insurrection, or reasonable apprehension thereof, and section 3916 authorizes the Governor to proclaim any portion of the state in a state of insurrection when in his judgment the maintenance of law and order will be promoted thereby, and the militia are employed to aid the civil authority.

[2] Under such powers the Governor may make the ordinary use of soldiers to suppress insurrection and his declaration of the existence of a state of insurrection is conclusive. Moyer v. Peabody, 212 U. S. 78, 29 Sup. Ct. 235, 53 L. Ed. 410; Luther v. Borden et al., 7 How. 1, 12 L. Ed. 581; United States v. Wolters (D. C.) 268 Fed. 69; In re Moyer, 35 Colo. 159, 85 Pac. 190, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189; State v. Brown, 71 W. Va. 519, 77 S. E. 243, 45 L. R. A. (N. S.) 996, Ann. Cas. 1914C, 1; Ex parte McDonald, 49 Mont. 454, 143 Pac. 947, L. R. A. 1915B, 988, Ann. Cas. 1916A, 1166.

[3] Was the proclamation of the Governor the declaration of a state of insurrection, or were the military forces called into service merely as aids to the civil officers for the purpose of assisting them in enforcing the laws? The proclamations do not use the word "insurrection," but the condition described of lawlessness and disorder beyond the control of the civil authorities, and the declaration of martial law, are equivalent to a declaration of the existence of that organized resistance to authority known as insurrection. In re Charge to Grand Jury (D. C.) 62 Fed. 828; Alleghany County v. Gibson, 90 Pa. 397, 35 Am. Rep. 670.

[4] When a state of war or insurrection exists, and the Governor has legally called into action the military forces of the state, the will of the commander becomes the controlling authority in the occupied territory, so far as he chooses to exert it, subject to the laws and usages of war. New Orleans v. Steamship Co., 20 Wall. 387, 22 L. Ed. 354; United States v. Diekelman, 92 U. S. 520, 23 L. Ed. 742; Luther v. Borden et al., 7 How. 1, 12 L. Ed. 581; United States v. McDonald

(D. C.) 265 Fed. 754; In re Egan, 5 Blatchf. 319, Fed. Cas. No. 4,303; Commonwealth v. Shortall, 206 Pa. 165, 55 Atl. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759; 40 Cyc. 383, 390. As said by the Supreme Court of the United States in the case of Moyer v. Peabody, 212 U. S. 78, 29 Sup. Ct. 235, 53 L. Ed. 410, of the powers vested in the Governor to suppress insurrection:

"That means that he shall make the ordinary use of the soldiers to that end, that he may kill persons who resist and, of course, that he may use the milder measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power."

[5] Does the military power in the occupied territory which is declared under martial law extend to the trial and punishment of offenders against regulations made by the military commander? Some cases are cited in support of the proposition that the military forces can do no more than to arrest and detain offenders against the laws of the state until they can be delivered to the civil authorities for trial, upon the restoration of peace and order. Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319; Ex parte McDonald, 49 Mont. 454, 143 Pac. 947, L. R. A. 1915B, 988, Ann. Cas. 1916A, 1166. No doubt the commander may avail himself of the courts as a means of trial, but he may also institute tribunals during the emergency to deal with offenders in the district. The Grapeshot, 9 Wall. 129, 19 L. Ed. 651; New Orleans v. Steamship Co., 20 Wall. 387, 22 L. Ed. 354; United States v. Wolters (D. C.) 268 Fed. 69; Winthrop on Mil. Law (2d Ed.) 1295, 1301; Davis on Mil. Law, 308; State v. Brown, 71 W. Va. 519, 77 S. E. 243, 45 L. R. A. (N. S.) 996, Ann. Cas. 1914C, 1; Ex parte Jones, 71 W. Va. 567, 77 S. E. 1029, 45 L. R. A. (N. S.) 1030, Ann. Cas. 1914C, 31. This is especially true of offenses against the military regulations, such as these petitioners committed, acts which are not offenses against the laws of the state.

In cases of military occupancy during war or insurrection, the passing of the military lines by persons without permission, the possession of arms and ammunition, the sale of intoxicating liquors, may cause the commander the loss of a battle, and yet these acts may not offend against the local laws. The usage in time of war has been to make regulations covering offenses in violation of the laws of war or of military discipline. Winthrop on Mil. Law (2d Ed.) 1310, 1311.

[6] Can the sentence of imprisonment by such a military tribunal be continued after peace is declared? This question has not been the subject of many reported decisions. The power to punish serious offenses by imposition of the death penalty is well understood, and the lesser punishment of imprisonment for life has been sustained. Ex parte Ortiz (C. C.) 100 Fed. 955. It is stated that during the Civil War such military commissions acting under the authority of the United States held trials and entered judgment in more than two thousand cases (Winthrop, Mil. Law [2d Ed.] 1302), and that sentences of imprisonment for terms of years and for life were imposed (Id. 1313). See, also, Davis on Mil. Law, 313. In case of serious offenses, it is not doubted that the sentence of imprisonment may continue during

the war or insurrection. If the punishment is inflicted but a few days before the establishment of peace, it would seem absurd that sentences, otherwise just, should at once expire. While the necessity for crushing of further resistance may have passed, the reason for continuance of sentences theretofore given has not ceased. The power of the military commander to make a lease of enemy city property extending beyond the termination of the war was sustained in New Orleans v. Steamship Co., 20 Wall. 387, 22 L. Ed. 354.

The conclusion is that, assuming the acts of the military court to have been done in accordance with the laws of the state, there is nothing in the exertion of this power which contravenes the right of due process of law guaranteed by the Constitution of the United States. The rule on the defendants to show cause why the writ of habeas corpus should not be issued will be discharged.